**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

GENIUS SPORTS MEDIA, INC.,                    )
                                              )
           Plaintiff,                         )
                                              )
                                              )    C.A. No.
v.                                            )
                                              )
                                              )    **JURY TRIAL DEMANDED**
SPORTSCASTR INC. (D/B/A PANDA                 )
INTERACTIVE),                                 )
                                              )
           Defendant.                         )

**COMPLAINT FOR FALSE ADVERTISING, UNFAIR COMPETITION,**
**AND DECEPTIVE TRADE PRACTICES**

Plaintiff Genius Sports Media, Inc. ("Genius"), by and through its undersigned attorneys,

for its Complaint against Defendant SportsCastr Inc. (d/b/a PANDA Interactive) ("PANDA"),

alleges as follows:

**NATURE OF THE ACTION**

1.      This case is about PANDA's public, fraudulent statements designed to undermine

legalized gambling and harm legitimate industry participants, including Genius.  Genius is among

the world's leading providers of sports data, sports media, and sports betting technology, including

because of its revolutionary watch-and-bet product, BetVision.  As a sports betting technology

pioneer, Genius has spent over two decades building its business the right way: securing

partnerships with major sports leagues including the NFL, developing best-in-class technology,

obtaining licenses in every state where online sports betting is legal, and integrating its products

with every major U.S. sportsbook.  BetVision allows users to watch sports while engaging in

interactive in-play experiences, and it is the exclusive betting platform for official NFL content—

a position earned through years of investment, innovation, and regulatory compliance that cost

millions of dollars to achieve.

2.      PANDA, having failed to develop a watch-and-bet product that sportsbooks want to buy, has chosen to deceive consumers about its business and capabilities to attract potential clients that it cannot win on the merits.  Formed as a mere commentary app, PANDA later shifted to the sports betting market and began targeting sportsbooks.  But PANDA has never developed a product sportsbooks liked.  So rather than build one, PANDA built a fiction: a marketing campaign designed to deceive sportsbooks and consumers into believing that PANDA offers a fully licensed watch-and-bet product.  PANDA's "PANDA Studio" purports to (a) be "licensed in all US states with legal gambling," (b) be integrated with sportsbooks, and (c) offer NFL watch-and-bet functionality.  It has done none of those things, making its marketing false and misleading.

3.      Indeed, PANDA has admitted outside of its marketing materials that it is not licensed in all states with legalized online sports betting.  By placing the official emblems associated with the betting regulatory bodies of eight U.S. states on its website, PANDA suggests it is licensed in those eight states, but even that is inaccurate.  Based on state licensing websites, PANDA is currently licensed in only *five* states.  Thus, it lacks licenses in at least *29 jurisdictions* where online sports betting is legal.  Likewise, although PANDA displays on its website the logos of DraftKings, BetMGM, and Caesars under the heading "Powerful Integrations," it has admitted outside of its marketing materials that it has not executed a single contract with *any* of them.  And, despite calling PANDA Studio a "watch-and-bet" product and displaying NFL betting scenarios in its product marketing, PANDA does not actually offer NFL watch-and-bet functionality—it does not distribute NFL live game video to sportsbooks for watch-and-bet purposes and does not meet the technological requirements to do so.

4.      PANDA has an additional problem with regard to its integration advertising.  If PANDA were to be integrated with sportsbooks, it lacks the licensing necessary to operate in the

2

RLF1 36070584v.1

jurisdictions where its integration "partners'" services are offered.  In other words, if PANDA is, in fact, making its product available in a state where PANDA is not licensed, it is violating the law by doing so.

5.      PANDA's false statements and unlawful operations cause real harm.  Its false and deceptive advertising undermines the public trust, harms legitimate market participants, and threatens to render legalized gambling's regulatory framework a dead letter.  Likewise, in the heavily regulated sports betting industry, licensing is a legal requirement.  Sportsbook operators face regulatory sanctions, fines, and license revocations if they engage unlicensed vendors.  A vendor's claim to be "fully licensed" is a threshold qualification that directly affects purchasing decisions.  By falsely claiming comprehensive licensing, PANDA induces sportsbooks to consider a vendor that could expose them to regulatory jeopardy.  By falsely claiming sportsbook integrations, PANDA signals market validation it has not earned.  By falsely claiming NFL capabilities, PANDA usurps an exclusive attribute that belongs to Genius alone.  Each falsehood is designed to take from Genius what PANDA has not earned on its own.  And PANDA's choice, to cut corners and bypass the licensing requirements in which Genius has invested, undermines the public policy behind requiring such licensing, including robbing consumers of the assurance of government oversight and harming Genius for playing by the rules.

6.      The injury to Genius is ongoing and irreparable.  PANDA's false advertising has damaged, and continues to erode, the goodwill Genius has built over more than twenty years.  It suggests a comparable alternative exists when it does not.  It undermines Genius' investment and efforts to meet the exacting technical requirements the NFL imposes for watch & bet licensing by implying PANDA Studio can deliver what only BetVision can.  And it threatens to damage the reputation of the entire watch-and-bet product category: when customers discover PANDA cannot

3

lawfully deliver what it promises in at least 29 jurisdictions, they may attribute the failure to watch-and-bet products generally.  PANDA's deception does not just harm Genius; it threatens to poison the market Genius has worked to build.

7.     As a result, Genius brings this action for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); deceptive business tactics under the Delaware Uniform Deceptive Trade Practices Act, 6 Del. C. § 2532; common law false advertising; methods of unfair competition and failure to license under the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A; and actions in equity to enjoin operation of an unlicensed business.  Genius seeks the relief necessary to end PANDA's deception and repair the damage it has caused, including monetary and injunctive relief, corrective advertising to remedy PANDA's false statements, and the costs and attorney's fees imposed on Genius to do so.

8.     In this case, the public and Genius' interests are aligned: PANDA has made false and misleading statements to consumers, participated unlawfully in the legalized gambling industry, and caused substantial harm.  PANDA should be held accountable.

## PARTIES

9.     Genius is a Delaware corporation with its place of business at 512 West 22nd St, 8th Floor, New York, NY 10011.

10.     On information and belief, PANDA is a Delaware corporation with a place of business in New York, New York, including at least: 100 Barclay St., 27B, New York, NY 10007; 1050 5th Ave, New York, NY 10028-0110; 595 Madison Avenue, New York, NY; and 7 Penn Plaza, Suite 1400, New York, NY 10001.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over Plaintiff's claims arising under the Lanham Act, 15 U.S.C. § 1125(a), pursuant to 28 U.S.C. §§ 1331 and 15 U.S.C. § 1121.

RLF1 36070584v.1

12.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a), because such claims form part of the same case or controversy as the federal claims and derive from a common nucleus of operative fact.

13.     This Court has personal jurisdiction over PANDA because PANDA is a registered business in Delaware and is therefore subject to general jurisdiction in this State.  PANDA has also committed acts of false advertising and unfair competition that were directed at and caused injury in this judicial district, giving rise to specific personal jurisdiction under Delaware's long-arm statute, 10 Del. C. § 3104(c).  Specifically, PANDA has disseminated its false claims through its publicly accessible websites to customers located in and doing business in Delaware, including sportsbook operators licensed in Delaware.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because PANDA is a registered business in Delaware and therefore resides in this District for purposes of § 1391(b)(1). Venue is also proper under § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including PANDA's dissemination of false advertising accessible to Delaware sportsbook operators and consumers.

### FACTUAL BACKGROUND

**A.     The Sports-Betting Industry and Watch-and-Bet Technology**

15.     The United States sports betting industry has experienced dramatic growth since the Supreme Court's 2018 decision in *Murphy v. National Collegiate Athletic Ass'n*, 138 U.S. 1461 (2018), which invalidated the Professional and Amateur Sports Protection Act and permitted states to legalize and regulate sports wagering individually.

16.     As of the date of this Complaint, approximately 33 states and the District of Columbia have legalized some form of online sports betting—meaning residents in those places can place bets on sporting events using their phones, computers, or tablets, rather than having to

RLF1 36070584v.1

visit a physical casino or betting location.[1]  This new industry is rapidly expanding and actively building its reputation.

17.     Within this quickly expanding marketplace, a specialized sector has emerged that operates behind the scenes to make sports betting work: the sports-betting technology sector. These are companies that provide services to sportsbook operators (the companies that run the betting platforms consumers use, like DraftKings or FanDuel).  These companies provide important services such as data distribution (obtaining, processing, and distributing real-time game statistics from sports leagues to sportsbooks), video streaming (recording, processing, and delivering live game footage), odds generation (calculating the betting lines), and interactive betting applications (the software that powers the actual betting experience).  The sportsbooks— the companies whose names everyday bettors recognize and whose apps they download to place bets—include DraftKings, FanDuel, BetMGM, Caesars, Fanatics, and BetRivers, which operate available across various states where online sports betting is legal.

18.     "Watch-and-bet" refers to a newer, more immersive type of sports betting technology that allows people to do two things at once: watch a live video stream of a sporting event and place bets on that same event, all within a single application on their phone, tablet, or computer.  In the past, people typically placed bets before a game started (called "pre-match" betting)—for example, betting on which team would win before kickoff.  More recently, "in-play" or "in-game" betting became popular, allowing people to place bets while a game is happening (such as betting on who will score the next touchdown).  With traditional in-play betting, the bettor

---

[1] These states are Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, Tennessee, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

6

might watch the game on one screen (like their TV) while placing bets on a separate device or app. "Watch-and-bet" combines everything into one seamless experience: the live game video and the betting interface appear together, so the user can see a play happen and immediately react by placing a bet, all without switching between apps or screens.

19.    Creating a watch-and-bet product is complex.  To offer this kind of integrated experience, a company must build technology sophisticated enough to meet the league's detailed specifications and customers' expectations.  These requirements can include things like how the video is displayed on screen; what interactive features can be included; geolocation services; security measures to prevent piracy or unauthorized recording; and compliance with the league's advertising rules.  Meeting all of these requirements requires significant investment in technology and engineering.

20.    For example, the National Football League ("NFL") did not allow any company to offer a commercial watch-and-bet product using its games until the 2023 NFL season.  At that time, Genius had developed and offered a product, BetVision, that complied with all the NFL's technological requirements.

21.    On information and belief, other companies in the sports betting industry also offer watch-and-bet products for sports leagues other than the NFL, including Sportradar's "emBET" product and Stats Perform's "Bet LiveStreams" product.

**B.    The Importance of Licensing in the Betting Industry**

22.    Each state that permits online sports betting maintains its own regulatory framework governing who may participate in the sports betting ecosystem—including not only the sportsbook operators themselves, but also the vendors and suppliers that provide technology, data, and services to those operators.

RLF1 36070584v.1

23.     In many states with legal online sports betting, sports-betting technology and service providers must hold a vendor or supplier license or registration issued by the relevant state gaming commission or regulatory authority.  These licensing requirements extend to not only the sportsbook operator itself, but also to vendors, suppliers, and technology providers whose products are used in connection with the offering of sports wagering.  Operating without the requisite license—or providing services to a licensed operator without holding a license—can expose both the vendor *and* operator to regulatory sanctions, including fines, license revocations, and criminal penalties.

24.     In some states, the availability of licenses is extremely limited.  And, in some states, sports gambling licenses are expensive and require large amounts of capital available upfront.  For example, Illinois allows only three licenses for online-only sportsbooks, which cost $20 million each. *See* Chris Altruda, *Illinois: The State with the $20 Million Sports Wagering License and No Takers*, SportsHandle (Nov. 6, 2023), https://sportshandle.com/illinois-online-only-sports-wagering-license-issues/; *Sports Betting Tax Rates and Licensing Fees*, BettingUSA.com, https://www.bettingusa.com/sports/taxes-and-licenses/.

25.     For these reasons, licensing status is a threshold consideration in sportsbook purchasing decisions.  Sportsbook operators evaluating sports betting technology providers—whether through formal requests for proposals ("RFPs"), competitive bidding processes, or direct negotiations—often require that vendors and suppliers be licensed in the states where the operator does business.  A sportsbook operating legally would not knowingly engage an unlicensed vendor, because doing so would expose the sportsbook to regulatory sanctions that could threaten its own license to operate.

8

RLF1 36070584v.1

26.     When sportsbook operators make purchasing decisions, they are also thinking about future business opportunities.  As a result, sportsbook operators select technology vendors not only for their current licensed footprint, but also for their ability to support future product expansions as additional states legalize sports betting or as the operator itself obtains new state-by-state authorizations.  A vendor that claims to be licensed in all applicable states signals to customers that it can serve as a comprehensive, long-term partner, which is desirable to sportsbook operators.

27.     As a result of these regulatory requirements, the scope of a vendor's licensing portfolio is a material criterion in sportsbook purchasing decisions.

**C.      Genius and its Revolutionary Watch-and-Bet Technology**

28.     Genius is a leader in the online sports betting industry and offers a wide range of technology to its sportsbook-customers.

29.     Genius was founded in 2001 in the United Kingdom under the name BetGenius and has grown into one of the world's leading providers of sports data, sports media, and sports betting technology.  Genius provides a comprehensive suite of products and services to sports leagues, media companies, and online sportsbooks, including data feeds, video streaming, odds generation, and interactive betting applications.

30.     Genius' data and video products allow sports leagues to collect, process, analyze, distribute, and advertise information and video about their events, or Genius can perform these services on a league's behalf.  Genius also provides products and services that allow online sportsbooks to improve their offerings to end-user bettors for the purpose of placing wagers before and during sporting events.  Among its most significant product categories, Genius offers products and services that collect raw data from live sporting event or matches run by sports leagues, process that data to allow sportsbooks to generate odds—including for live betting, multi-bet combinations

9

(e.g., parlays), and other purposes—and allow its league partners to provide video, including real-time streaming of live events to sportsbooks for betting purposes.

31.     Genius has undertaken numerous investments over the last several decades to offer premium versions of these products and services to sportsbooks.  Among its most significant investments are its rights to data and video for sports league games.  Genius bid on these rights on the open market and has acquired rights to several leagues, including the National Football League.

32.     Through significant research and development, intellectual property acquisitions, and regulatory investments, Genius developed and offers its flagship watch-and-bet product, BetVision.  BetVision allows sportsbooks to offer a high-speed application where consumers (bettors) can both watch live streams of games for which Genius has the relevant rights and place bets on events happening in those games within the same application.  Today, BetVision offers best-in-class quality for video, odds generation, odds display, and other betting-required characteristics.

33.     Since 2022, BetVision has been the exclusive watch-and-bet product for official NFL content due to the time and resources Genius invested in this product.  BetVision was specifically designed to meet the strict technological requirements imposed by the NFL as a prerequisite for others to distribute low latency live NFL game video feeds for watch-and-bet.  It cost Genius millions of dollars to develop and implement the features necessary to meet the NFL's requirements, and those features are unique to Genius' product.

34.     BetVision is fully integrated with many major U.S. sportsbooks, which reflects the quality and reliability of the product.  This integration is the result of years of investment in partnerships, business development, research, technical development, and regulatory compliance.

10

35.     In addition to BetVision, Genius offers a suite of separate products in the sports technology space, including MultiBet (which allows end users to place same-game parlays during a live sports game/match) and outsourced trading, which are designed to be fully integrated with sportsbook operators' trading platforms.

36.     Genius is fully licensed to operate in all states where online sports betting is legal in the United States.  As a result, sportsbooks integrated with BetVision can offer the product in every state where they are licensed to operate.  Genius has invested substantial resources in obtaining and maintaining these licenses, including through paying application fees, hiring compliance personnel, and keeping up with ongoing reporting obligations and submissions to relevant regulatory agencies—all of which may differ on a state-by-state basis.

**D.      PANDA's Failed Watch-and-Bet Technology and False Advertising**

37.     PANDA was formed in the 2016–2017 time period primarily as a business-to-consumer, or B2C, company under the name SportsCastr.  At that time, PANDA provided consumers with the ability to broadcast real-time commentary on live sports games.  On information and belief, PANDA did not market its SportsCastr platform as having betting capabilities.  It merely allowed customers to watch a commentator discussing a live sports game.  That original business model had nothing to do with sports betting technology or the business-to-business, or B2B, sports betting market that Genius serves.

38.     PANDA later transitioned from a B2C to a B2B company and began marketing products and services to online sportsbooks.  This shift came at a time when PANDA had no established relationships with sportsbooks, no proven track record in the B2B sports betting space, and no meaningful competitive advantage in watch-and-bet technology.

39.     Nevertheless, one of the products PANDA markets to sports media companies, betting affiliates, and sportsbooks is called "PANDA Studio," which PANDA promotes as a

11

watch-and-bet product.  As set forth below, PANDA's advertisements publicly claim that PANDA Studio has watch-and-bet capabilities that it does not.  PANDA also purports to be licensed in all jurisdictions where online sports betting is legal, when it is not.

40.    The motivation behind PANDA's false representations is plain: PANDA is trying to compensate for its inability to develop a legitimate, sellable watch-and-bet product.  PANDA knows that, but for its false representations, it cannot offer a product that would interest sportsbooks, because it has an inferior product that, in at least 29 jurisdictions, it lacks the licensing to legally operate.  But PANDA is not concerned with candor, it is concerned with profit.  PANDA should be foreclosed from profiting from its deception.

i.    The Licensing Claims: PANDA Falsely Advertises Itself as "Fully Licensed."

41.    As of the date of this Complaint, PANDA makes and has made materially false and misleading statements about its licensing status on its public-facing website, which is directed to and accessible by sportsbook operators and members of the public nationwide.

42.    First, on its PANDA Studio website, PANDA claims that it is "Fully Licensed" and that it is "licensed in all US states with legal gambling."[2]  This statement is false and misleading.  On information and belief, there are at least 33 states and the District of Columbia with legalized online sports betting in which PANDA does not hold the required license.[3]

**Fully Licensed**
PANDA is licensed in all US states with legal gambling.

---

[2]    https://studiopanda.live.
[3]    For purposes of this complaint, Plaintiff uses the figures related to states with legal ***online*** gambling. However, the statements on PANDA's website referencing "legal gambling" are broader. There are 40 jurisdictions with some form of legal gambling in the United States, bringing the number of jurisdictions in which PANDA does not hold a license to 35.

43.    Second, on its corporate website, PANDA represents that "PANDA is fully licensed as an online sports betting vendor and/or supplier in all applicable states, including."[4]  Following this statement are the official emblems associated with the betting regulatory bodies of eight U.S. states, as shown below:



44.    This statement, too, is false and misleading because PANDA is not licensed in "all applicable states."  It, in fact, lacks licensing in 29 of the jurisdictions where online sports betting is legal.  Moreover, this statement uses the word "including," followed by the display of the emblems associated with the betting regulatory bodies for Tennessee, Arizona, Colorado, Indiana, New Jersey, West Virginia, Pennsylvania, and Michigan, indicating that PANDA's licenses are not *limited* to those states, but instead that those states are a sample of its larger licensing portfolio.

45.    But that is not the case.  In public filings in *SportsCastr Inc. v. Genius Sports Ltd.*, PANDA concedes it is not licensed in most of those jurisdictions, instead contending: "PANDA is licensed in ***eight states***," as shown below:

---

4    https://pandainteractive.com/aboutus.

13

> **I.    The Court Should Not Exclude Mr. Bergman's Antitrust Damages Opinion Based on States Where PANDA Is Not Currently Licensed to Operate.**
>
> Mr. Bergman's damages opinion considers revenue that PANDA could have made in all states where sports betting is legal absent Genius's tying. (*Id.* ¶¶ 38–39, 261–75). Because PANDA is licensed in eight states (Wood Decl. Ex. 2 (Oct. 9, 2025 Bergman Tr.) 154:2–7), Genius argues that PANDA can only seek damages attributable to revenue in those eight states (Mot. at 1, 7–8). Specifically, Genius argues that Mr. Bergman's opinion should be excluded under Federal

*See, e.g.*, PANDA's Opp'n to Genius' Mot. to Exclude Bergman, *SportsCastr Inc. v. Genius Sports Ltd.*, Dkt. 484 at 3, No. 2:23-cv-00472-JRG (E.D. Tex.) (the "PANDA Patent Litigation"). PANDA further admitted: "PANDA is not currently licensed to operate" in certain other states. *See* PANDA Patent Litigation, Dkt. 565, at 5.

46.    In reality, PANDA is licensed in even fewer than that. Publicly available licensing records reflect that PANDA is only licensed in Colorado, New Jersey, West Virginia, Pennsylvania, and Michigan. But that means it is not licensed to operate in Arizona, Arkansas, Connecticut, Delaware, Florida, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Missouri, Nevada, New Hampshire, New York, North Carolina, Ohio, Oregon, Rhode Island, Tennessee, Vermont, Virginia, Washington, Wisconsin, Wyoming, and the District of Columbia.

47.    PANDA's misrepresentations were crafted with the intent to deceive actual and potential customers into believing that it is licensed in all 34 jurisdictions where online sports betting is legal. PANDA knows that its potential customers must buy sports betting products from fully licensed entities (like Genius) and therefore is deceiving customers about its licensing status.

14

RLF1 36070584v.1

ii.    The Integration Claims: PANDA Falsely Advertises PANDA Studio as Integrated with Sportsbooks

48.    In addition to its licensing statements, PANDA makes materially false and misleading representations about the scope of its integrations with U.S. sportsbooks—representations designed to create the false impression that PANDA Studio is already deployed and operational within the platforms of the largest sportsbook operators in the country.

49.    On its PANDA Studio website, PANDA represents that it offers "Powerful Integrations" that are "Compatible With" DraftKings, FanDuel, BetMGM, and Caesars.[5]  The website displays the logos of each of these four sportsbook operators alongside this claim, as shown below, conveying to the reasonable reader that PANDA Studio is already integrated with—and therefore compatible with and operational on—the platforms of these specific sportsbooks.



50.    Further, when website viewers scroll over the logos, PANDA represents that users can "display live odds from" each of these sportsbooks "alongside your videos," further conveying to the reasonable reader that PANDA Studio is already integrated with, operational on, and therefore compatible with the platforms of these specific sportsbooks.

---

[5]    https://studiopanda.live.

RLF1 36070584v.1



51.     Similarly, on a sub-page of its website, PANDA further represents: "Powerful Activations; Integrations; Activate powerful third-party integrations to enhance your experience with some of the leading companies in the space."[6]  Beneath this representation is a display of DraftKings, FanDuel, BetMGM, and Caesars logos, among others, as shown below.  And when website viewers scroll over the sportsbook logos, PANDA again represents that customers can "display live odds from" each sportsbook "alongside your videos."

---

[6]    https://studiopanda.live/features#integrations.

RLF1 36070584v.1



52.     Read in context, this representation conveys that PANDA Studio is integrated with and activated on the platforms of these major sportsbooks.  PANDA offers to "enhance [customer] experience" with these affiliations that do not exist.

53.     Similarly, PANDA lists FanDuel as its "client" on a separate page and lists features it purports to provide FanDuel, as shown below.[7]

---

[7]     https://studiopanda.live/clients.



**PANDA STUDIO**

## Client Spotlights

CONTACT US ▶





54.    These representations are false and misleading, including by necessary implication. On information and belief, PANDA does not have any contracts and is not currently integrated with any of these sportsbooks.  These sportsbooks are current customers of Genius, and Genius' products are integrated into their platforms.

55.    Just recently, in public filings, PANDA admitted that it "was unable to execute any contracts or letters of intent with sportsbooks."  *See* PANDA Patent Litigation, Dkt. 484 at 6–7. This admission is irreconcilable with PANDA's contemporaneous website representations that it has "Powerful Integrations" with DraftKings, FanDuel, BetMGM, and Caesars, and that FanDuel is a "client."  A company that has been "unable to execute any contracts or letters of intent with sportsbooks" cannot simultaneously be "integrated" with four of the largest sportsbook operators in the United States.

56.    Moreover, the display of the DraftKings, FanDuel, BetMGM, and Caesars logos beneath the heading "Powerful Integrations" and "Compatible With"—without any qualifying

18

language indicating that such integrations are, for example, merely planned, partial, or aspirational—conveys to PANDA's actual and potential customers that PANDA Studio is currently integrated with and deployable on those operators' platforms.

57.    These representations were crafted with the intent to deceive.  PANDA knows that its potential customers value products whose licensure and efficacy have been verified and accepted by their largest competitors.  By displaying these claims publicly, PANDA seeks to deceive customers into believing that it has achieved business partnerships, which reflect the value and quality of its product, when it has not.

iii.    The NFL Claims: PANDA Falsely Advertises PANDA Studio as Offering NFL Watch-And-Bet

58.    PANDA also makes materially false and misleading representations conveying that it offers watch-and-bet functionality for NFL content—a capability that belongs to Genius by virtue of its investments to develop its BetVision product to meet the NFL's myriad technological requirements.

59.    On its public website, PANDA promotes its purported watch-and-bet capabilities and product PANDA Studio through a page specifically dedicated to its product features.  This webpage, accessible at studiopanda.live/features, is designed to market PANDA Studio to prospective sportsbook customers and others in the industry and prominently displays content and graphics suggesting that PANDA offers watch-and-bet functionality for major professional sports leagues, including the NFL.

19

60.    PANDA advertises its product with the NFL Betting Features Display shown below.  The image purports to show use of the PANDA Studio product and displays NFL betting options—including NFL team names, NFL game scenarios, and NFL-specific bet types.[8]



61.    This graphic conveys that PANDA Studio offers watch-and-bet capability for NFL content—i.e., the ability for end users to simultaneously watch live NFL game streams and place bets on NFL events within an application using PANDA Studio.

62.    This representation is false and misleading, including by necessary implication.  On information and belief, PANDA does not offer, and cannot offer, true watch-and-bet functionality for NFL content.

---

[8]    https://studiopanda.live/features. The red lines do not appear on PANDA's website but were added by Plaintiff to identify the relevant portions of the graphic.

RLF1 36070584v.1

63. BetVision was specifically designed to meet the NFL's stringent technological specifications, which cost millions of dollars to implement and are unique to Genius' product. On information and belief, PANDA Studio does not meet the NFL's technical requirements for delivering a watch-and-bet product for NFL content and thus is precluded from doing so.

64. Nevertheless, PANDA's marketing materials affirmatively display NFL-branded betting scenarios in connection with its product features, inaccurately conveying to prospective customers that PANDA Studio can deliver what only BetVision can: a true NFL watch-and-bet experience.

iv. PANDA's Scheme of Deception and Unfair Competition

65. The three categories of false representations above were designed to create a false and misleading impression that PANDA Studio is a genuine, fully-operational watch-and-bet product—fully licensed, fully integrated, and fully capable of delivering NFL watch-and-bet content. Each category of misrepresentation reinforces the others: the licensing claims suggest regulatory compliance, the integration claims suggest market validation, and the NFL claims suggest product value. Together, they paint a picture of a product that PANDA cannot deliver.

66. Although the literal falsity of each of these claims has been demonstrated at length above, at the very least, each representation is misleading by necessary implication because the net impression conveyed to the reasonable sportsbook operator is one of comprehensive licensing, active integration, and NFL capability—none of which accurately describes PANDA's actual situation or product offering.

67. As explained above, PANDA's false representations across all three categories are also material to the purchasing decisions of PANDA's target audience, including Genius' customers.

68.    First, sportsbook operators are legally required to use only licensed vendors in most jurisdictions.  Licensing status is a threshold qualification in the vendor-selection process, as licenses can be slow, difficult, and expensive to obtain.  PANDA's claims that it is licensed in states where it is not directly addresses this concern and are likely to influence purchasing decisions.

69.    Second, the quality and scope of a vendor's customer base reflects the quality of its product.  Sportsbook operators considering a new technology vendor look to see which other major operators have already adopted the vendor's product—a form of market validation.  By falsely claiming integration with DraftKings, FanDuel, BetMGM, Caesars, and others, PANDA signals that sophisticated purchasers in the market have already validated PANDA Studio.  This representation is inherently material to sportsbook operators who look to peers for purchasing guidance.

70.    Third, the NFL is the most popular sport for online sports betting in the United States.  A vendor's representation that it can deliver NFL watch-and-bet content goes to the inherent qualities and characteristics of the product and is thus material.

71.    And PANDA's own behavior confirms materiality across all three categories.  PANDA prominently features its licensing claims, integration claims, and NFL product advertisements on multiple pages of its primary marketing website, the forum through which it publicly offers PANDA Studio.  Advertisers prominently display information they believe to be material to customers' purchasing decisions.

72.    Moreover, PANDA made all three categories of false representations with the intent to deceive customers into thinking that PANDA has features and licensing that it does not.

22

PANDA knows that, but for its misrepresentations, it cannot obtain business from sportsbook operators.

**E.    PANDA's Dishonest and Deceptive Conduct Is Likely to Harm Genius**

73.    The legalization of online sports betting provided an important opportunity for states and sports betting providers to provide an accessible environment for safe and regulated sports betting.  Indeed, consumers rely on these regulations, and betting providers' compliance with these regulations, to bet in a safe and reliable way.

74.    Genius has been a pioneer in this industry because of its substantial investment in developing technology, competing on the open market for sports content rights, and obtaining necessary regulatory licensing approvals to operate where online sports betting is legal.  PANDA has not.  After failing to succeed in the market as a B2C provider, PANDA set out to do what Genius did: succeed in watch-and-bet.  But rather than compete by legal and legitimate means, PANDA opted to cut corners on licensing and product development and misrepresent its capabilities instead, to position itself as a legitimate sports data provider.  By displaying these claims publicly, PANDA passes off a hard-earned attribute of Genius' products as applicable to PANDA's and creates a false impression to sportsbooks.

75.    PANDA's false and misleading representations are likely to have a direct effect on Genius.  When sportsbook operators discover that PANDA has falsely represented its licensing status or watch-and-bet capabilities, sportsbooks are likely to attribute those misrepresentations to companies, like Genius, that are actual providers of watch-and-bet products and operate with the required licensing.

76.    That harms Genius' reputation and goodwill, which it built by investing substantial resources to operate in compliance with legislative requirements and develop a premier watch-and-bet product.

RLF1 36070584v.1

77.     Similarly, Genius' investment in BetVision's technological requirements is premised on the ability to offer sportsbooks the premier watch-and-bet product for NFL games. PANDA's false representation that it, too, offers NFL watch-and-bet capability directly undermines Genius' investments.

78.     Genius has also invested years in developing and maintaining integrations with all major U.S. sportsbooks.  By falsely claiming equivalent integration status, PANDA devalues the achievement of actual integration and the market validation it represents.

79.     As long as these representations are made to Genius' current and future customers, Genius is likely to suffer irreparable harm from PANDA's conduct, for which there is no adequate remedy at law.

**COUNT I**
**FALSE ADVERTISING UNDER THE LANHAM ACT (15 U.S.C. § 1125)**

80.     Genius incorporates by reference the allegations in the foregoing paragraphs as though fully set forth herein.

81.     Section 43(a)(1)(B) of the Lanham Act provides that any person who, in connection with any goods or services, "uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."  15 U.S.C. § 1125(a)(1)(B).

82.     PANDA has made and continues to make false and misleading statements of fact in commercial advertising and promotion regarding the nature, characteristics, and qualities of its products and services.   These statements include three categories of misrepresentation: (a) PANDA's claims to be "licensed in all US states with legal gambling" and "fully licensed as

24

an online sports betting vendor and/or supplier in all applicable states" (the "Licensing Claims");
(b) PANDA's claims that it offers "Powerful Integrations" that are "Compatible With" DraftKings,
FanDuel, BetMGM, Caesars, and others, and that FanDuel is a "client" of PANDA's (the
"Integration Claims"); and (c) PANDA's display of NFL betting options and NFL-branded content
conveying that PANDA Studio offers watch-and-bet capability for NFL content (the "NFL
Claims").

83.     As discussed above, these statements are false and misleading for the reasons
mentioned.  Each category constitutes "commercial advertising or promotion" because it is and
was published on PANDA's commercial websites and, on information and belief, additional
promotional materials for the purpose of promoting PANDA Studio to prospective customers and
are disseminated sufficiently to the relevant purchasing public.

84.     PANDA's false statements have actually deceived or have the tendency to deceive
a substantial segment of the relevant audience into believing that PANDA has licensing,
integrations, and/or product features that it does not.

85.     PANDA's misrepresentations are material to the purchasing decisions of its target
audience for the reasons set forth above.  Licensing status, sportsbook integration, and NFL content
capabilities are each an important criterion in sportsbook vendor selection and concern inherent
qualities or characteristics of vendor/supplier products.

86.     PANDA has caused its false and misleading statements to enter interstate
commerce by publishing them on publicly accessible websites available to customers throughout
the United States.

87.     As a direct and proximate result of PANDA's false advertising, Genius is likely to
suffer injury to its reputation and goodwill.  In particular, through PANDA's false and misleading

25

RLF1 36070584v.1

statements, actual and potential Genius customers are likely to believe that Genius too engages in such lies, thereby devaluing its brand and standing in the industry.  These injuries are directly traceable to PANDA's false advertising, which targets the very sportsbook operators that Genius serves, and they would be redressed by the injunctive relief and damages sought herein.  The resulting confusion and reputational harm of PANDA's actions persists so long as those false claims remain publicly accessible to Genius' current and prospective customers.

88.     PANDA's false advertising has been knowing, intentional, and willful.  PANDA knows it is licensed in fewer than eight states, knows it has no sportsbook contracts, and knows it does not hold NFL distribution rights—yet continues to represent otherwise.  This willful deception makes this case "exceptional" within the meaning of 15 U.S.C. § 1117.

89.     Pursuant to 15 U.S.C. §§ 1116 and 1117(a), Genius is entitled to injunctive relief, damages, disgorgement of profits, enhanced damages, costs, and attorneys' fees.

## COUNT II
## VIOLATION OF THE DELAWARE UNIFORM
## DECEPTIVE TRADE PRACTICES ACT (6 DEL. C. § 2532)

90.     Genius incorporates by reference the allegations in the foregoing paragraphs as though fully set forth herein.

91.     PANDA's conduct as described herein—encompassing its Licensing Claims, Integration Claims, and NFL Claims, which are false and misleading for the reasons mentioned— constitutes deceptive trade practices in violation of the DDTPA, 6 Del. C. § 2532(a), at least as follows:

92.     Section 2532(a)(5): PANDA represents that its goods and services have sponsorship, approval, characteristics, uses, affiliation, or benefits that they do not have.  By claiming to be licensed in all US states with legal gambling, PANDA represents that PANDA Studio can be lawfully deployed in all such states, when it cannot.  By claiming PANDA Studio is

RLF1 36070584v.1

integrated with major sportsbooks, PANDA represents that its product has the characteristic of active sportsbook integration, when it does not.  By displaying NFL betting content, PANDA represents that its product has NFL watch-and-bet capability, when it does not.

93.    Section 2532(a)(7): PANDA represents that its goods and services are of a particular standard, quality, or grade when they are of another.  PANDA represents that PANDA Studio is licensed in all jurisdictions where online sports betting is legal, when it is not.  PANDA represents that PANDA Studio is integrated with sportsbooks with which it is not integrated.  And PANDA represents that it has an NFL-capable watch-and-bet product when it does not.

94.    Section 2532(a)(9): PANDA advertises goods and services with the intent not to sell them as advertised.  PANDA advertises an NFL-capable watch-and-bet product that it cannot deliver.

95.    Section 2532(a)(12): PANDA engages in conduct that creates a likelihood of confusion or misunderstanding as to its licensing status, integration status, and product capabilities.

96.    As a direct and proximate result of PANDA's false advertising, Genius is likely to suffer injury to its reputation and goodwill.  In particular, through PANDA's false and misleading statements, actual and potential Genius customers are likely to believe that Genius too engages in such lies, thereby devaluing its brand and standing in the industry.  These injuries are directly traceable to PANDA's false advertising, which targets the very sportsbook operators that Genius serves, and they would be redressed by the injunctive relief and damages sought herein.  The resulting confusion and reputational harm of PANDA's actions persists so long as those false claims remain publicly accessible to Genius' current and prospective customers.

RLF1 36070584v.1

97. PANDA's deceptive trade practices have been knowing, intentional, and willful, rendering this an exceptional case and entitling Genius to attorneys' fees and costs pursuant to 6 Del. C. § 2533(b) and treble damages pursuant to 6 Del. C. § 2533(c).

98. Genius is entitled to preliminary and permanent injunctive relief pursuant to 6 Del. C. § 2533(a).

## COUNT III
## COMMON LAW UNFAIR COMPETITION – FALSE ADVERTISING

99. Genius incorporates by reference the allegations in the foregoing paragraphs as though fully set forth herein.

100. The common law of unfair competition prohibits the use of deceptive trade practices—including false advertising—as a means to try and compete.

101. PANDA's Licensing Claims, Integration Claims, and NFL Claims—taken individually and collectively—constitute material misrepresentations that PANDA made with the intent to deceive sportsbook customers that PANDA had licensing and product capabilities that it did not. Alternatively, such statements were made with a reckless disregard for the truth.

102. As discussed above, these statements are false and misleading for the reasons mentioned. PANDA's false advertising is directed at a nationwide market. Sportsbook operators operate across multiple states, and the harm to Genius occurs across state lines.

103. Each category of false representation is material to the purchasing decisions of PANDA's target audience, including Genius' customers.

104. PANDA's own behavior confirms materiality across all three categories. PANDA prominently features its Licensing Claims, Integration Claims, and NFL Claims on multiple pages of its primary marketing website, the forum through which it publicly offers PANDA Studio.

28

Advertisers prominently display information they believe to be material to customers' purchasing decisions.

105.   PANDA's false representations have actually deceived or have the tendency to deceive a substantial segment of the relevant audience into believing that PANDA has licensing, integrations, and/or product features that it does not.

106.   As a direct and proximate result of PANDA's false advertising, Genius is likely to suffer injury to its reputation and goodwill.  In particular, through PANDA's false and misleading statements, actual and potential Genius customers are likely to believe that Genius too engages in such lies, thereby devaluing its brand and standing in the industry.  These injuries are directly traceable to PANDA's false advertising, which targets the very sportsbook operators that Genius serves, and they would be redressed by the injunctive relief and damages sought herein.  The resulting confusion and reputational harm of PANDA's actions persists so long as those false claims remain publicly accessible to Genius' current and prospective customers.

107.   PANDA's false advertising has been knowing, intentional, and willful.  PANDA knows it is licensed in fewer than eight states, knows it has no sportsbook contracts, and knows it does not hold NFL distribution rights—yet continues to represent otherwise.

108.   Genius is entitled to preliminary and permanent injunctive relief, damages, and such other relief as the Court deems just and proper.

**COUNT IV**
**COMMON LAW UNFAIR COMPETITION – FAILURE TO LICENSE**
**(DISTRICT OF COLUMBIA)**

109.   Genius incorporates by reference the allegations in the foregoing paragraphs as though fully set forth herein.

110.   The District of Columbia requires that any individual or entity engaged in activity connected with sports wagering obtain all required licenses before conducting such activity.  *See*

29

D.C. L. 22-312, § 305(a)(1) ("No individual, group of individuals, or entity may engage in an activity connected with sports wagering . . . unless all the licenses … have been duly obtained."). The District of Columbia's Sports Wagering Lottery Amendment Act establishes a comprehensive licensing framework governing all participants in the sports wagering ecosystem, including technology vendors and suppliers.

111.    Genius holds the requisite District of Columbia license to operate as a sports betting technology vendor and/or supplier in the District and bears the substantial costs of maintaining that license, including application fees, background investigation costs, compliance personnel, ongoing reporting obligations, and the technological and personnel infrastructure required to satisfy the requirements.

112.    PANDA, as a B2B vendor marketing and offering PANDA Studio to sportsbook operators for use in connection with sports wagering, qualifies as a "supplier" within the meaning of the statute and must hold a supplier's license to lawfully conduct its business in the District of Columbia.  In the alternative, to the extent PANDA's activities are characterized as those of an "operator" under the statutory scheme, the same licensing obligation applies.

113.    On information and belief, PANDA does not hold a supplier license, operator license, or any other license or authorization issued by the District of Columbia Office of Lottery and Gaming ("OLG") or any other D.C. regulatory body authorizing it to provide sports-betting products or services to sportsbook operators in the District of Columbia.  Nevertheless, PANDA seeks to sell or lease and/or actually sells or leases PANDA Studio in D.C.

114.    Seeking to sell or lease, or actually selling or leasing, PANDA Studio in D.C. without a supplier's license constitutes conduct that is independently illegal under D.C. L. 22-312,

30

§ 305, which expressly prohibits engaging in activity connected with sports wagering without first obtaining all required licenses.

115.    As a result of PANDA's unfair competition in the District of Columbia, Genius is likely to suffer damages including erosion of goodwill and jeopardy to its business position in the D.C. market in the form of reputational harm.

116.    Genius is entitled to preliminary and permanent injunctive relief, damages, and such other relief as the Court deems just and proper.

**COUNT V**
**COMMON LAW UNFAIR COMPETITION – FAILURE TO LICENSE (MARYLAND)**

117.    Genius incorporates by reference the allegations in the foregoing paragraphs as though fully set forth herein.

118.    In addition to its false advertising or in the alternative, if PANDA is integrated with sports betting enterprises in Maryland via FanDuel, DraftKings, BetMGM, Caesars, or one of the other partners or clients listed on its website, then, on information and belief, it is doing so unlawfully and without a license.

119.    The State of Maryland has enacted a comprehensive regulatory framework governing sports wagering.  Maryland's Sports Wagering Application Review Commission ("SWARC") and the Maryland Lottery and Gaming Control Agency ("MLGCA") administer the licensing of all participants in the state's sports wagering ecosystem, including technology vendors and suppliers that provide products and services to licensed sportsbook operators.

120.    Genius holds the requisite Maryland license to operate as a sports betting technology vendor and/or supplier in the State of Maryland and bears the substantial costs of maintaining that license, including application fees, background investigation costs, compliance

31

personnel, ongoing reporting obligations, and the technological and personnel infrastructure required to satisfy the requirements.

121.    On information and belief, PANDA does not hold a vendor, supplier, or other license or authorization from SWARC, MLGCA, or any other Maryland regulatory body authorizing it to provide sports-betting products or services to sportsbook operators in the State of Maryland.  PANDA also does not appear on Maryland's publicly available list of licensed sports wagering vendors.  *See* Md. Lottery & Gaming Control Agency, Approved Vendors & Sponsors (May 15, 2026), https://www.mdgaming.com/wp-content/uploads/2026/05/Approved-Vendors-Spnsors-May-15-2026.pdf.

122.    Despite lacking the requisite Maryland license, PANDA offers and markets PANDA Studio to sportsbook operators who operate in the State of Maryland, represents itself as being licensed in the state, and purports to have partners utilizing those services, like FanDuel, that operate in the state of Maryland.  If PANDA is participating in sports betting enterprises in Maryland with the purported integration partners listed on its website, then, on information and belief, it is doing so unlawfully and without a license.

123.    PANDA's operation and/or attempt to operate in Maryland when it does not have the requisite licenses to do so constitutes unfair competition under Maryland common law because it represents conduct tainted by fraud, deceit, trickery and/or otherwise unfair and illegal methods—including because PANDA simultaneously misrepresents to prospective customers that it is licensed in the state.

124.    PANDA's conduct is likely to damage and jeopardize Genius' business and reputation in Maryland.  Genius is likely to suffer damages including erosion of goodwill and jeopardy to its business position in the Maryland market in the form of reputational harm.

RLF1 36070584v.1

125. Genius is entitled to preliminary and permanent injunctive relief, damages, and such other relief as the Court deems just and proper.

## COUNT VI
## COMMON LAW UNFAIR COMPETITION –
## FAILURE TO LICENSE (MASSACHUSETTS)

126. Genius incorporates by reference the allegations in the foregoing paragraphs as though fully set forth herein.

127. In addition to its false advertising or in the alternative, if PANDA is integrated with sports betting enterprises in Massachusetts via FanDuel, DraftKings, BetMGM, Caesars, or one of the other partners or clients listed on its website, then, on information and belief, it is doing so unlawfully and without a license.

128. The Commonwealth of Massachusetts has enacted a comprehensive regulatory framework governing sports wagering. Massachusetts prohibits any person or entity from "accepting, facilitating or operating a sports wagering operation" without first obtaining the requisite license or authorization. Mass. Gen. Laws ch. 23N, § 21. The Massachusetts Gaming Commission ("MGC") administers licensing for all participants in the state's sports wagering ecosystem, including B2B technology vendors and suppliers that provide products and services to licensed sportsbook operators.

129. Genius holds the requisite Massachusetts license to operate as a sports betting technology vendor and/or supplier in the Commonwealth of Massachusetts and bears the substantial costs of maintaining that license, including application fees, background investigation costs, compliance personnel, ongoing reporting obligations, and the technological and personnel infrastructure required to satisfy the requirements.

33

130.    On information and belief, PANDA does not hold a vendor, supplier, or other license or authorization from the MGC or any other Massachusetts regulatory body authorizing it to provide sports-betting products or services to sportsbook operators in Massachusetts.

131.    Despite lacking the requisite Massachusetts license, PANDA offers and markets PANDA Studio to sportsbook operators who operate in Massachusetts—including DraftKings, which is headquartered in Boston, Massachusetts— represents itself as being licensed in the state, and purports to have integration partners utilizing those services, like FanDuel, that operate in the state of Massachusetts. If PANDA is participating in sports betting enterprises in Massachusetts with the purported integration partners listed on its website, then, on information and belief, it is doing so unlawfully and without a license.

132.    PANDA further markets PANDA Studio as offering "Powerful Integrations" "Compatible With" DraftKings and other major sportsbooks, and as offering watch-and-bet capability for NFL content—all of which are directed at and accessible by Massachusetts-based sportsbook operators and their personnel.

133.    PANDA's operation and/or attempt to operate in Massachusetts when it does not have the requisite licenses to do so constitutes unfair competition under Massachusetts common law, including because it represents conduct that is immoral, unethical, oppressive, or unscrupulous and that is tainted by fraud, deceit, trickery and/or otherwise unfair and illegal methods—including because PANDA simultaneously misrepresents to prospective customers that it is licensed in the state.

134.    PANDA's conduct is likely to damage and jeopardize Genius' business and reputation in Massachusetts. Genius is likely to suffer damages including erosion of goodwill and

34

jeopardy to its business position in the Massachusetts market in the form of reputational harm, including with a major customer DraftKings.

135.    Genius is entitled to preliminary and permanent injunctive relief, damages, and such other relief as the Court deems just and proper.

## COUNT VII
## UNFAIR COMPETITION – FAILURE TO LICENSE
## (MASSACHUSETTS, MASS. GEN. LAWS ANN. CH. 93A, § 11)

136.    Genius incorporates by reference the allegations in the foregoing paragraphs as though fully set forth herein.

137.    In addition to its false advertising or in the alternative, if PANDA is integrated with sports betting enterprises in Massachusetts via FanDuel, DraftKings, BetMGM, Caesars, or one of the other partners or clients listed on its website, then, on information and belief, it is doing so unlawfully and without a license.

138.    The Commonwealth of Massachusetts prohibits any person or entity from "accepting, facilitating or operating a sports wagering operation" without first obtaining the requisite license or authorization.  Mass. Gen. Laws ch. 23N, § 21.  The Massachusetts Gaming Commission ("MGC") administers licensing for all participants in the state's sports wagering ecosystem, including B2B technology vendors and suppliers that provide products and services to licensed sportsbook operators.

139.    Genius holds the requisite Massachusetts license to operate as a sports betting technology vendor and/or supplier in the Commonwealth of Massachusetts and bears the substantial costs of maintaining that license, including application fees, background investigation costs, compliance personnel, ongoing reporting obligations, and the technological and personnel infrastructure required to satisfy the requirements.

35

140. On information and belief, PANDA does not hold a vendor, supplier, or other license or authorization from the MGC or any other Massachusetts regulatory body authorizing it to provide sports-betting products or services to sportsbook operators in Massachusetts.

141. Despite lacking the requisite Massachusetts license, PANDA offers and markets PANDA Studio to sportsbook operators who operate in Massachusetts—including DraftKings, which is headquartered in Boston, Massachusetts—represents itself as being licensed in the state, and purports to have partners utilizing those services, like FanDuel, that operate in the state of Massachusetts. If PANDA is participating in sports betting enterprises in Massachusetts with the purported integration partners listed on its website, then, on information and belief, it is doing so unlawfully and without a license.

142. PANDA further markets PANDA Studio as offering "Powerful Integrations" "Compatible With" DraftKings and other major sportsbooks, and as offering watch-and-bet capability for NFL content—all of which are directed at and accessible by Massachusetts-based sportsbook operators and their personnel.

143. PANDA has engaged in an unfair method of competition by operating and/or seeking to operate in the Massachusetts sports betting market without the license required by Mass. Gen. Laws ch. 23N, § 21—including because it simultaneously represents to prospective customers that it is licensed there. This conduct is independently illegal (violating Massachusetts's express statutory prohibition on unlicensed sports wagering activity), is immoral, unethical, and unscrupulous.

144. PANDA's unfair methods of competition extend beyond its mere unlicensed status. As described in Sections D, E, and F of this Complaint, PANDA also engages in affirmatively deceptive conduct—falsely claiming nationwide licensing, integration with major sportsbooks

(including Massachusetts-headquartered DraftKings), and NFL watch-and-bet capability—that compounds the competitive unfairness of its unlicensed operation.  Each of these false representations constitutes an independently deceptive act or practice within the meaning of Chapter 93A.

145.    PANDA's conduct is likely to damage and jeopardize Genius' business and reputation in Massachusetts.  Genius is likely to suffer damages including erosion of goodwill and jeopardy to its business position in the Massachusetts market in the form of reputational harm, including with a major customer DraftKings.

146.    Genius is entitled to preliminary and permanent injunctive relief, damages, and such other relief as the Court deems just and proper.

**COUNT VIII**
**ACTION IN EQUITY TO ENJOIN OPERATION OF UNLICENSED BUSINESS**
**(ILLINOIS)**

147.    Genius incorporates by reference the allegations in the foregoing paragraphs as though fully set forth herein.

148.    The State of Illinois prohibits any "person" from "engag[ing] in any activity in connection with sports wagering in this State unless all necessary licenses have been obtained in accordance with" the Sports Wagering Act "and the rules of the Board and the Department."  230 ILCS § 45/25-20(a).  "No person or entity may engage in a sports wagering operation or activity without first obtaining the appropriate license."  *Id.*  Under the statute, there are master sports wagering, occupational, supplier, and management services provider licenses.  *Id.*

149.    Illinois' Sports Wagering Act provides a "[s]upplier license" for entities offering "services related to the equipment or other gaming items and data" used by a "master sports wagering licensee."  *Id.* § 45/25-50(a).  To obtain such a license, an applicant must, among other

37

requirements, "pay to the [Illinois Gaming] Board a nonrefundable license and application fee in the amount of $150,000." *Id.* § 45/25-50(d). "Beginning 4 years after issuance of the initial supplier license, a holder of a supplier license shall pay a $150,000 annual license fee." *Id.*

150. Under Illinois' Sports Wagering Act, suppliers must ensure they meet the statute's requirements, including by providing significant disclosures to the Illinois Gaming Board. *Id.* § 45/25-50(e). For example, "[a] supplier shall submit to the Board a list of all sports wagering equipment and services sold, delivered, or offered to a master sports wagering licensee in [the] State[.]" *Id.*

151. Genius holds the requisite Illinois license to operate as a sports betting supplier in Illinois and bears the substantial costs of maintaining that license, including application fees, compliance personnel, ongoing reporting obligations, and the technological and personnel infrastructure required to satisfy these requirements.

152. On information and belief, PANDA does not hold a supplier, master sports wagering, occupational, or management services provider license authorizing it to operate in Illinois. Nevertheless, PANDA promotes itself as having integration partners that operate in Illinois that offer its PANDA Studio product. If PANDA Studio is, in fact, available in Illinois, then PANDA is unlawfully engaging in a sports wagering activity without the required licenses.

153. The prevention of unlicensed sports gambling and sports gambling-related businesses in Illinois benefits the public. Indeed, the Illinois Gaming Board Administrator Marcus D. Fruchter specifically stated that "[i]llegal online gambling operations threaten consumer protections, undermine responsible gaming safeguards, and are antithetical to the public's interest

RLF1 36070584v.1

in regulated gaming."[9]   And Illinois Attorney General Kwame Raoul stated that "[u]nlicensed gaming operators put Illinois consumers at risk and undermine the integrity of our regulated gaming market."[10]

154.     PANDA's conduct is likely to damage and jeopardize Genius' business, reputation, and license in Illinois.  By operating without a valid license, PANDA directly decreases the value of Genius' license.  PANDA further devalues the license by avoiding the associated costs and burdens required to maintain a valid license in Illinois.  And by undermining the integrity of the regulated gaming market, PANDA has harmed Genius' reputation as a lawful entity.

155.     Genius is entitled to preliminary and permanent injunctive relief restraining PANDA from operating in the Illinois sports wagering market without the licenses required by the Illinois Sports Wagering Act.

## COUNT IX
## ACTION IN EQUITY TO ENJOIN OPERATION OF UNLICENSED BUSINESS
## (IOWA)

156.     Genius incorporates by reference the allegations in the foregoing paragraphs as though fully set forth herein.

157.     The State of Iowa authorizes sports wagering only "when conducted by a licensee as provided in" Chapter 99F of the Iowa Code.  Iowa Code Ann. § 99F.3.

158.     Under Iowa's Chapter 99F.17, "[a] manufacturer or distributor of gambling games or implements of gambling shall annually apply for a license upon a form prescribed by the commission before the first day of April in each year and shall submit the appropriate license fee."

---

[9]     *Illinois Gaming Board and Attorney General's Office Issue more than 60 Cease-and-Desist Letters to Illegal Online Casino and Sweepstakes Operators*, Illinois (Feb. 5, 2026) https://www.illinois.gov/news/release.html?releaseid=32173.

[10]    *Id.*

39

RLF1 36070584v.1

*Id.* § 99F.17(1). The license fee for a distributor is $1,000 annually, and the license fee for a manufacturer is $250 annually. *Id.* A licensee conducting gambling games "shall acquire all gambling games or implements of gambling from a distributor licensed pursuant to this chapter." *Id.* § 99F.17(2).

159. Licensed distributors and manufacturers in Iowa bear significant regulatory burdens, including: providing written notice to the commission showing items sold to licensees, *see id.* § 99F.17(5), and allowing the inspection of items sold, *see id.* § 99F.17A.

160. Genius holds the requisite Iowa license to operate as a sports betting technology distributor or manufacturer in Iowa and bears the substantial costs of maintaining that license, including application fees, compliance personnel, ongoing reporting obligations, and the technological and personnel infrastructure required to satisfy these requirements.

161. On information and belief, PANDA does not hold a distributor or manufacturer license, advance deposit sports wagering operator license, occupational license, or any other license or authorization from the Iowa Racing and Gaming Commission authorizing it to provide sports-betting products or services to sportsbook operators in Iowa. Nevertheless, PANDA promotes itself as having integration partners that operate in Iowa that offer its PANDA Studio product. If PANDA Studio is, in fact, available in Iowa, then PANDA is unlawfully engaging in a sports wagering activity without the required licenses.

162. The prevention of unlicensed sports gambling and sports-gambling-related businesses in Iowa directly benefits the public. Indeed, Iowa Gaming Commission Administrator Tine Eick stated, "[w]hen Iowans gamble on unlicensed platforms, they're putting their money and their personal information at serious risk." *Iowa Gaming Regulators Hope to Curb Illegal Wagering Platforms with Proposed Bill*, Cami Koons, KCRG (Jan. 5, 2026, 4:59 PM EST),

40

RLF1 36070584v.1

https://www.kcrg.com/2026/01/05/iowa-gaming-regulators-hope-curb-illegal-wagering-platforms-with-proposed-bill/.

163.    PANDA's conduct is an injurious invasion of Genius' property rights in its valid license because Genius' license is exclusive against unlicensed operators.

164.    Further, PANDA's conduct is likely to damage and jeopardize Genius' business, reputation, and license in Iowa.  By operating without a valid license, PANDA directly decreases the value of Genius' license.  PANDA further devalues the license by avoiding the associated costs and burdens required to maintain a valid license in Iowa. And by undermining the integrity of the regulated gaming market, PANDA has harmed Genius' reputation as a lawfully operating entity.

165.    Genius is entitled to preliminary and permanent injunctive relief restraining PANDA from operating in the Iowa sports wagering market without the licenses required by the Iowa Racing and Gaming Commission.

**COUNT X**
**ACTION IN EQUITY TO ENJOIN OPERATION OF UNLICENSED BUSINESS**
**(KENTUCKY)**

166.    Genius incorporates by reference the allegations in the foregoing paragraphs as though fully set forth herein.

167.    The Commonwealth of Kentucky prohibits any person from "conduct[ing], manage[ing], or offer[ing] to conduct sports wagering within the Commonwealth of Kentucky without obtaining a license from the corporation." KRS § 230.811(1). Sports wagering "shall not be offered in this state except as authorized by" the statutory scheme. KRS § 230.805(2). Under the statute, a provider must obtain a sports wagering license from the Kentucky Horse Racing and Gaming Corporation before offering sports wagering and may contract with up to three service providers to conduct and manage sports wagering operations. KRS §§ 230.805(2), (4); 230.811(1).

41

168.   Kentucky's sports wagering statutes require that, as a prerequisite to obtaining a service provider license, the applicant must pay an initial fee of $50,000 and pay an annual renewal fee of $10,000. KRS § 230.814(2)–(4). In addition, sports wagering licensees and their service providers must comply with extensive regulatory requirements, including: utilizing geolocation or geofencing technology to ensure that wagers are accepted only from patrons physically located in the Commonwealth; verifying the identity and age of all patrons prior to allowing them to engage in sports wagering; limiting each patron to one account per service provider; maintaining servers within the state; and protecting the private, personal information of patrons using "commercially and technologically reasonable means" consistent with industry standards. KRS § 230.805(3).

169.   Genius holds the requisite Kentucky license to operate as a sports betting supplier in Kentucky and bears the substantial costs of maintaining that license, including the significant application fees, compliance personnel, ongoing reporting obligations, and the technological and personnel infrastructure required to satisfy these requirements.

170.   On information and belief, PANDA does not hold a sports wagering license, service provider authorization, or any other license issued by the Kentucky Horse Racing and Gaming Corporation or any other Kentucky regulatory body authorizing it to provide sports-betting products or services to sportsbook operators in the Commonwealth of Kentucky.  Nevertheless, PANDA promotes itself as having integration partners that operate in Kentucky that offer its PANDA Studio product.  If PANDA Studio is, in fact, available in Kentucky, then PANDA is unlawfully engaging in a sports wagering activity without the required licenses.

171.   The prevention of unlicensed sports gambling and sports-gambling-related businesses in Kentucky benefits the public.

42

172.    PANDA's conduct is likely to damage and jeopardize Genius' business, reputation, and license in Kentucky. By operating without a valid license, PANDA directly decreases the value of Genius' license. PANDA further devalues the license by avoiding the associated costs and burdens required to maintain a valid license in Kentucky. And by undermining the integrity of the regulated gaming market, PANDA has harmed Genius' reputation as a lawful entity.

173.    Genius is entitled to preliminary and permanent injunctive relief restraining PANDA from operating in the Kentucky sports wagering market without the licenses required by the Kentucky Horse Racing and Gaming Corporation.

## COUNT XI
## ACTION IN EQUITY TO ENJOIN OPERATION OF UNLICENSED BUSINESS (VIRGINIA)

174.    Genius incorporates by reference the allegations in the foregoing paragraphs as though fully set forth herein.

175.    The Commonwealth of Virginia requires that any person who manages, administers, or controls wagers on a sports betting platform, or who maintains or operates the software or hardware of a sports betting platform, must hold a sports betting supplier license issued by the Virginia Lottery Department. 11 VAC 5-70-70; 11 VAC 5-70-80. Additionally, "[a]ny person not approved by the director as a registered sports betting vendor may not perform vendor functions for a permit holder or sports betting supplier within the Commonwealth." 11 VAC 5-70-80(A).

176.    Virginia's sports wagering regulations impose specific licensing requirements on sports betting suppliers. To obtain a supplier license to operate a permit holder's sports betting platform, an applicant must submit the required electronic application and pay a wire transfer of $125,000. 11 VAC 5-70-70(E). For a supplier license other than to operate a sports betting

43

platform, the applicant must pay a wire transfer of $50,000. 11 VAC 5-70-70(G). The Virginia Lottery Department conducts background investigations of applicants, their employees, and directors, and may deny licensure based on criminal history, financial irregularities, prior regulatory violations, or other disqualifying factors. 11 VAC 5-70-20; 11 VAC 5-70-110.

177.    In addition, Virginia's sports betting framework imposes extensive ongoing duties on permit holders and their suppliers, including: ensuring that only persons physically located in Virginia are able to place bets through the platform; protecting the confidential information of bettors; preventing prohibited and underage betting; establishing procedures to detect and report suspicious or illegal betting activity; and complying with all reporting, reserve, and insurance requirements established by the Virginia Lottery Board. Va. Code Ann. § 58.1-4034(A).

178.    Genius holds the requisite Virginia supplier license to operate as a sports betting supplier in the Commonwealth and bears the substantial costs of maintaining that license, including the significant application and background investigation fees, compliance personnel, ongoing reporting obligations, and the technological and personnel infrastructure required to satisfy these requirements.

179.    On information and belief, PANDA does not hold a sports betting supplier license, vendor registration, or any other license or authorization issued by the Virginia Lottery Department or any other Virginia regulatory body authorizing it to provide sports-betting technology, data, or services to permit holders in the Commonwealth of Virginia.  Nevertheless, PANDA promotes itself as having integration partners that operate in Virginia that offer its PANDA Studio product. If PANDA Studio is, in fact, available in Virginia, then PANDA is unlawfully engaging in a sports wagering activity without the required licenses.

RLF1 36070584v.1

180.    Despite lacking the requisite Virginia license, PANDA offers and markets PANDA Studio to sportsbook operators who operate in Virginia and represents itself as being licensed in the state.

181.    The prevention of unlicensed sports gambling and sports-gambling-related businesses in Virginia benefits the public. Virginia's licensing framework was enacted to ensure the integrity, security, and responsible operation of sports wagering within the Commonwealth.

182.    PANDA's conduct is likely to damage and jeopardize Genius' business, reputation, and license in Virginia. By operating without a valid license, PANDA directly decreases the value of Genius' license. PANDA further devalues the license by avoiding the associated costs and burdens required to maintain a valid license in Virginia. And by undermining the integrity of the regulated gaming market, PANDA has harmed Genius' reputation as a lawful entity.

183.    Genius is entitled to preliminary and permanent injunctive relief restraining PANDA from operating in the Virginia sports wagering market without the licenses required by the Virginia Lottery Board.

## PRAYER FOR RELIEF

WHEREFORE, Genius prays for relief and judgment against PANDA as follows:

A.    An order declaring that PANDA:

(i)    Engaged in false and misleading advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

(ii)    Engaged in unfair, deceptive, and unlawful trade practices and false advertising in violation of 6 Del. C. § 2532, Mass. Gen. Laws Ann. ch. 93A, § 1, and the common law of unfair competition.

45

RLF1 36070584v.1

      (iii)    Engaged in an unlawful practice of offering, operating, facilitating, or supplying sports betting and/or sports betting technology in violation of state licensing requirements.

B.    Preliminary and permanent injunctive relief, prohibiting PANDA, its officers, agents, employees, attorneys, successors, assigns, and all persons in active concert or participation with any of them, from:

      (i)    Representing that PANDA is "licensed in all US states with legal gambling" or "fully licensed as an online sports betting vendor and/or supplier in all applicable states," or any substantially similar statement, unless and until such statements become truthful;

      (ii)    Displaying state emblems or logos in a manner that implies PANDA holds licenses in more states than it actually does;

      (iii)    Representing that PANDA Studio is "integrated with" or "compatible with" DraftKings, FanDuel, BetMGM, Caesars, or any other sportsbook with which PANDA does not have an active, executed integration agreement;

      (iv)    Displaying the logos of sportsbook operators in a manner that implies an integration or partnership relationship that does not exist;

      (v)    Representing or implying that PANDA Studio offers watch-and-bet functionality for NFL content, including through the display of NFL-branded betting scenarios, unless and until PANDA holds the contractual rights and technical certifications necessary to deliver such functionality;

46

RLF1 36070584v.1

(vi)    Making any other false or misleading representations regarding PANDA's licensing status, sportsbook integrations, or product capabilities to prospective or current customers;

(vii)    Operating in any of the 29 jurisdictions in which it does not hold a valid license.

C.    An order requiring PANDA to disseminate corrective advertising to all current and prospective customers, clearly and conspicuously disclosing its actual licensing status, actual sportsbook integration status, and actual NFL content capabilities, as well as stating that its previously advertised statements were false, in a form and through channels to be approved by the Court.

D.    Compensatory damages for Genius' injuries, including damage to goodwill and the costs of any corrective advertising in which Genius engages to correct the misperception in the marketplace created by PANDA's actions, in an amount to be proven at trial.

E.    Disgorgement of all profits PANDA has earned as a result of its false advertising, including enhanced damages under 15 U.S.C. § 1117 for PANDA's willful or deliberate conduct.

F.    Treble damages pursuant to 6 Del. C. § 2533(c).

G.    Reasonable attorneys' fees and costs, including pursuant to 15 U.S.C. § 1117(a) and 6 Del. C. § 2533(b).

H.    Pre-judgment and post-judgment interest at the maximum rate permitted by law.

RLF1 36070584v.1

I.      That PANDA be directed to file with the Court and serve on Genius, within thirty (30) days after entry of any injunction, a written report under oath setting forth in detail the manner and form in which PANDA has complied with the Court's order.

J.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Genius demands trial by jury in this action of all issues so triable.

COUNSEL:

Jeanne M. Heffernan
KIRKLAND & ELLIS LLP
401 West 4th Street
Austin, TX 78701
(512) 678-9100
jheffernan@kirkland.com

Joshua L. Simmons
Abbey E. Quigley
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
joshua.simmons@kirkland.com
abbey.quigley@kirkland.com

Dated: June 10, 2026

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
RICHARDS, LAYTON, & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
farnan@rlf.com

*Attorneys for Plaintiff Genius Sports Media, Inc.*

48

RLF1 36070584v.1